**IN THE UNTIED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | CIVIL ACTION |
|        Plaintiff, : | |
| : | |
| : | |
|     v. : | No. 07-3800 |
| : | |
| : | |
| ROBERT A. BERLACHER, et al., : | |
|        Defendants. : | |

_____:

**Goldberg, J.**                                                                 **September 13, 2010**

## MEMORANDUM OPINION

The Securities and Exchange Commission (hereinafter "SEC") commenced this civil action against Defendant Robert A. Berlacher and several investment funds he oversaw, claiming Defendants engaged in insider trading and securities fraud.[1]  The essence of the SEC's claims is that Berlacher, after receiving non-public information regarding four (4) separate Private Investment in Public Equity offerings (hereinafter "PIPEs"), engaged in unlawful and deceptive trading.

A bench trial was held on March 9-11, 2010.  After considering the evidence and written submissions, we conclude that the SEC has not sustained its burden of proof on the insider trading count and two of the fraud claims.  We find, however, that the SEC has met its burden on two separate fraud claims.  Our findings of fact and conclusions of law are set forth below.

---

[1] Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) and Section 17(a) of the Securities Act (15 U.S.C. § 77g(a)).

1

## I.    FINDINGS OF FACT

### A.  General Background

1.  Berlacher managed and oversaw several investment funds.  These funds have also been named as Defendants and are:  Lancaster Investment Partners, L.P.; Northwood Capital Partners, L.P.; Cabernet Partners, L.P.; Chardonnay Partners, L.P.; Insignia Partners, L.P.; VFT Special Ventures, Ltd.; LIP Advisors, LLC; and RAB Investment Company, LLC.  (Stip. Facts, ¶ 1.)

2.  Prior to the transactions at issue, Berlacher had participated in what is known as PIPE transactions.  These transactions typically allow publicly traded companies that are seeking an immediate infusion of funds to raise capital privately.  In exchange, investors receive restricted stock in the companies issuing the PIPEs at a discounted price.  Typically, three to four months after a PIPE is issued, the SEC permits the registration statement for the PIPE to become effective. Once the registration statement becomes effective, the previously restricted PIPE shares lose their restricted status and can be publically traded.  (Stip. Facts, ¶¶ 2-3.)

3.  The general public is unaware of PIPE offerings during the negotiation period with investors until the transaction is closed and announced.  (Stip. Facts, ¶ 3.)   The public announcement of an issuer's PIPE offering can depress the price of the company's stock because the public company is issuing new shares of stock, which typically decreases the price per share due to dilution.  (N.T. 3/11/10, pp. 10-11.)

4.  As with any investor in a PIPE, Berlacher typically did not receive specific information such as the number of shares to be offered or price per share until the PIPE transaction was to close.  (N.T. 3/10/10, p. 82.)

5.  The four PIPE transactions at issue here involve the following companies: Radyne

ComStream, Hollywood Media, International Display Works (hereinafter "IDWK"), and SmithMicro. The SEC further alleges that Defendants engaged in insider trading regarding only the Radyne PIPE. The SEC also alleges Defendants made material, fraudulent misrepresentations in all four transactions. (Stip. Facts, ¶¶ 4-5.)

6. During the relevant period (early 2004), Berlacher received calls from Brian Sognefest, a placement agent with Roth Capital Partners (hereinafter "Roth"), regarding the Radyne, Hollywood, and IDWK transactions. (Ex. 67, pp. 56-66.)

7. When those calls were placed, it was Roth's policy to advise potential PIPE investors they would be restricted from disclosing information about the PIPE or trading in the issuer's securities. (Ex. 67, pp. 54-56, 58.)

8. Regarding the Radyne and Hollywood transactions, Sognefest's testimony was unclear as to whether he read Roth's policy regarding PIPE transactions to Berlacher. Although somewhat equivocal as to exactly what he relayed to Berlacher regarding the Radyne and Hollywood transactions, Sognefest did advise Berlacher he was "restricted from trading in the stock or speaking about the deal." The SEC introduced an "over the wall" form signed by Sognefest, signifying that he had generally spoken to Berlacher about the restrictions associated with both PIPE transactions. (Exs. 2, 9, 12; Ex. 67, pp. 57-66.)

9. On the IDWK transaction, Sognefest did not speak to Berlacher regarding the PIPE transaction restrictions, nor is there any evidence such a conversation took place. (Ex. 67, pp. 59-60.) 10. During all of his discussions with Berlacher, Sognefest did not supply specific details regarding the number of shares to be offered, or the stock price for each respective PIPE transaction. (N.T. 3/11/10, pp. 40, 46-48; Ex. 67, pp. 39-40.)

11. In February of 2005, Berlacher received an email from Joseph Reda at CE Unterberg, a brokerage firm, about a SmithMicro PIPE. Aside from what is contained in the SmithMicro stock purchase agreement, there is no evidence Reda and Berlacher had a conversation or came to a meeting of the minds via some other form of communication, regarding the confidentiality of the SmithMirco PIPE. (N.T. 3/11/10, pp. 116-24; Ex. 13.)

12. After expressing interest in the PIPEs to the placement agent, but before signing the stock purchase agreements (hereinafter "SPAs") with these companies, Berlacher undertook certain trading, discussed in greater detail _infra_, on behalf of the Defendant entities. Berlacher traded through a company called CDC Securities, Inc. (hereinafter "CDC"), a broker/dealer with whom he contracted to establish barrier option positions. (N.T. 3/10/10, pp. 29-30; Exs. 82-84, 87-90, 93-94, 99, 104-16, 119-26.)

13. Berlacher referred to all of the transactions at issue, traded through CDC, as "barrier options" on a "basket" of securities, which he explained provided Defendants with an option regarding each underlying position reflected in the "basket." Pursuant to these options, Defendants had the contractual right (_i.e._, "the option") to have CDC deliver to them an actual long or short position in each security that was the underlying asset for the barrier option for a definite period of time in the future. (N.T. 3/10/10, pp. 30-31.)

14. Berlacher would typically initiate the "barrier option" transactions himself, either through CDC or another broker, based upon which broker he believed would provide the best price in executing the transaction. (N.T. 3/10/10, pp. 46-47; N.T. 3/11/10, p. 10.)

15. CDC required Berlacher to pledge that he would not undertake any trading in options while in possession of material, non-public information with respect to any issuer whose stock

was the asset underlying the option.  (Ex. 128, p. 10, ¶ 15(j).)

16.  Berlacher used the means or instruments of interstate commerce, or of the mail, or of the facilities of the national securities exchange, in connection with the transactions at issue. (Stip. Facts, ¶ 6.)

17.  The acts, practices, transactions at issue, and course of business, occurred within the Eastern District of Pennsylvania.  (Stip. Facts, ¶ 7.)

**B.  The Radyne Transaction**

18.   Berlacher was contacted by Sognefest on January 28, 2004 regarding the Radyne PIPE.  (Ex. 2.)

19.  The Radyne PIPE transaction was not a "typical" PIPE wherein the issuing company actually issued new shares.  Rather, the transaction involved the private  sale of existing stock owned by the company's majority shareholder to other shareholders.   Thus, the Radyne transaction did not dilute the equity interests of existing shareholders.  (Stip. Facts, ¶¶ 9, 17-20; N.T. 3/10/10, p. 143.)

20.  Berlacher entered into a special option agreement through CDC for Radyne stock on January 28, 2004, January 30, 2004, and February 2, 2004, which provided the right to receive a 114,000 share short position between $11.87 and $12.58 per share in Radyne during the period of the agreement.  Thirteen minutes after Berlacher was contacted by Sognefest on January 28, 2004, Berlacher created his first short position in Radyne through his CDC basket.  (N.T. 3/10/10, pp. 63-66; Exs. 25, 82-84, 87-90, 93-94, 97.)

21.  On January 29, 2004, the following message appeared on a Yahoo! Finance message

board regarding Radyne:

> I just heard Roth Capital will begin a road show next week to try to sell 9.7 million shares of unregistered RAN shares. It sounds like the largest holder-Stetsys Pt. Ltd. Wants out. I agreed with the RADN lovers but I believe the easy short term money has been made–once these shares are placed (I heard $9-$10 is the range), and the shares become registered (usually 40-60 days), the float will increase from 4.6M to 14.3M . . .

(Stip. Facts, ¶ 21.)

22. On February 12, 2004, Berlacher signed a SPA for the Radyne PIPE, agreeing to purchase 137,500 shares of Radyne at $9.25 per share. The Radyne SPA contains the representation that "Such Purchaser (including its affiliates that are entities) does not hold a short position, directly <u>or indirectly</u>, in any shares of the Company's common stock." (Ex. 1, ¶ 2.3(j) (emphasis added); Exs. 82-84, 87-90, 93-94.)

23. Despite the specific language contained in the SPA, Berlacher, through the Defendant entities, did in fact indirectly hold a short position in Radyne's common stock during the relevant time period. (Ex. 1, ¶ 2.3(j).)

24. The Radyne PIPE was publicly announced on February 17, 2004. (N.T. 3/10/10, p. 141.)

25. On April 7, 2004, the SEC declared the resale registration statement relating to the Radyne PIPE shares effective. That declaration permitted PIPE purchasers like Berlacher to sell those shares to the public. (Ex. 5.)

26. Dr. Prowse, Berlacher's expert witness, was accepted as an expert in statistical economic analysis and PIPE transactions. Prowse's background and experience includes a Ph.D. in economics from UCLA, as well as being a Chartered Financial Analyst, which requires a three

year course in the valuation of financial securities. Prowse previously worked for the Federal Reserve Bank for ten years and is currently the Senior Managing Director of FTI Consulting. (N.T. 3/10/10, pp. 133-37.)

27. Prowse conducted an event study regarding the Radyne PIPE. Such a study is a generally accepted scientific method to determine whether certain stock price movement is due to the release of material information into the public domain. (N.T. 3/10/10, p. 139.) We accept and credit the following testimony offered by Prowse:

- Pertinent dates to analyze the movement of Radyne's stock price in relation to information released about the Radyne PIPE are: January 30, 2004, which is the day after the first Yahoo! posting occurred; February 9, 2004, when a second Yahoo! posting occurred; February 17, 2004, when the official press release regarding the PIPE was issued; and February 19, 2004, when Radyne's CEO had a conference call with market analysts about the PIPE. (N.T. 3/10/10, p. 141.);

- If material information released about a company is generally good news, then the stock price will increase. Conversely, if the material information is bad news, then the stock price will go down. If the stock price does not move in a significant manner, then the information released was not material. (N.T. 3/10/10, pp. 147-48.);

- "Noise" is the day-to-day market volatility of a stock. Material information can cause stock price movement which is distinguishable from "noise." (N.T. 3/10/10, pp. 152-53.);

- Radyne's "noise" over the course of a year is 5%, up or down, per week. (N.T. 3/10/10, pp. 154-55.);

- Historically, Radyne stock tends to react to material news on the immediate trading day or the day after. (N.T. 3/10/10, p. 155.);

- After accounting for market and industry movement, Radyne's movement was - 1.9% on January 30, 2004; - 6.25% on February 9, 2004; - 5.17% on February 17, 2004; and + 4% on February 19, 2004. (N.T. 3/10/10, pp. 154, 160.); and

- The stock price movements on February 17, 2004, and February 18, 2004, were more akin to "noise" than material movements and were statistically indistinguishable from the normal volatility of Radyne's stock price movements. (N.T. 3/10/10, p. 159.)

28. Based on the above data and conclusions, Prowse concluded that the Radyne PIPE was not material information. (N.T. 3/10/10, p. 161.)

## C. **The Hollywood Transaction**

29. Sognefest contacted Berlacher on January 22, 2004 regarding the Hollywood PIPE transaction. During this conversation, Sognefest advised Berlacher the PIPE information was confidential and that securities trading was restricted. (Exs. 2, 9, 12; Ex. 67, pp. 57-66.)

30. Between February 3, 2004, and February 9, 2004, Berlacher, through CDC, engaged in thirteen separate transactions on behalf of the Defendant entities involving Hollywood Media, whereby he purchased the right to receive a 100,000 share long position in Hollywood stock. (Exs. 104-16.)

31. The Hollywood SPA was subsequently signed by Berlacher on February 9, 2004, on behalf of Cabernet Partners, L.P., RAB Investment Company, LLC, and Insignia Partners, L.P, whereby Berlacher agreed to purchase a total of 100,000 shares in the PIPE transaction at $2.84 per share. (Stip. Facts, ¶ 32.)

32. The Hollywood SPA contains the representation that the investor "has not purchased, sold or entered into <u>any put option, short position or similar arrangement</u> with respect to Common Stock or the Shares, Warrants or Warrant Shares." (Ex. 8, ¶ 3.2(b)(iii) (emphasis added).)

33. Berlacher, through the Defendant entities, did not purchase, sell or enter into a put option, short position, or similar arrangement with Hollywood stock during the relevant time

period.  (Ex. 8, ¶ 3.2(b)(iii); Exs. 104-16.)

34.  The Hollywood PIPE was publicly announced on February 10, 2004.  (Ex. 10.)

**D.  The IDWK Transaction**

35.  A placement agent from Roth contacted Berlacher on April 27, 2004 about the IDWK
PIPE.  (Ex. 12.)

36.  Sognefest does not remember speaking to Berlacher regarding the IDWK transaction.
Unlike the Radyne and Hollywood transactions, the SEC was unable to produce any
documentation memorializing any conversation between Sognefest and Berlacher regarding the
confidentiality of the PIPE and trading restrictions associated with the PIPE.  Although the SEC
did produce a Roth form indicating that someone at Roth spoke with Berlacher, Sognefest does
not know who signed the form.  (N.T. 3/9/10, p. 12; Ex. 12; Ex. 67, p. 59.)

37.  On April 29, 2004, through CDC, Berlacher entered into a special option agreement
on IDWK stock, on behalf of the Defendant entities, which provided the right to receive a 20,000
share long position in IDWK during the period of the contract.  On April 30, 2004, and May 4,
2004, Berlacher sold 15,000 shares of that long option.  (N.T. 3/10/10, pp. 111-12; N.T. 3/11/10,
pp. 51, 57-58; Exs. 119-26.)

38.  The IDWK SPA was signed by Berlacher on May 12, 2004.  In the agreement,
Berlacher agreed to purchase a total of 50,000 PIPE shares at $4.50 per share.  (Stip. Facts, ¶ 34.)

39.  The IDWK SPA states:

Such Investor has not directly or indirectly, nor has any Person acting on behalf of or
pursuant to any understanding with such Investor, engaged <u>in any transactions in the
securities of the Company</u> (including, without limitations, any Short Sales involving the
Company's securities) since the time that such Investor was first contacted by the
Company or Roth Capital Partners, LLC regarding an investment in the Company.  For

the purposes of this Section, "Short Sales" include, without limitation, all "short sales" as defined by Rule 3b-3 of the Exchange Act and include all types of direct and indirect stock pledges, forward sale contracts, option, puts, calls, short sales, swaps and similar arrangements (including on a total return basis), and sales and other transactions through non-US broker dealers or foreign regulated brokers having the effect of hedging the securities or investment made under this Agreement. Such Investor covenants that neither it nor any Person acting on its behalf or pursuant to any understanding with it will engage in any transactions in the securities of the Company (including Short Sales) prior to the time that the transactions contemplated by this Agreement are publicly disclosed."

(Ex. 11, ¶ 3.2(f) (emphasis added).)

40. Berlacher, through the Defendant entities, did engage in transactions in the securities of IDWK. (N.T. 3/10/10, pp. 111-12; N.T. 3/11/10, pp. 51, 57-58; Ex. 11, ¶ 3.2(f); Exs. 119-26.)

41. The IDWK PIPE was publicly announced on May 13, 2004. (Ex. 14.)

### E. The SmithMicro Transaction

42. A placement agent from C.E. Unterberg Towbin LLC contacted Berlacher about a SmithMicro PIPE on February 15, 2005. (Ex. 20.)

43. The SEC did not introduce any testimony regarding what Berlacher may have been told by the Towbin agent regarding trading restrictions and confidentiality associated with the SmithMicro PIPE.

44. On February 15, 2005, Berlacher entered into a special option agreement through CDC on SmithMicro stock, on behalf of the Defendant entities, which gave them the right to acquire a 75,000 share short position in SmithMicro during the term of the option. The same day, Berlacher also initiated the purchase of 75,000 actual shares of SmithMicro stock through CDC. (N.T. 3/10/10, p. 123; Exs. 99, 102.)

45. The SPA for SmithMicro, dated February 18, 2005, was signed by Berlacher on behalf of Northwood Capital Partners, L.P., and NCP Advisors, LLC. In the agreement, Berlacher

agreed to purchase 100,000 shares of SmithMicro at $6.40 per share.  (Stip. Facts, ¶ 28.)

46.  The SmithMicro SPA states:

> The Purchaser represents and warrants that, during the period beginning on the date on which C.E. Unterberg, Towbin LLC, a Delaware limited liability company (the "Placement Agent"), first contacted such Purchaser regarding a transaction contemplated by this Agreement (and involving the Company) and ending on the Closing Date, neither it nor any Affiliate (as defined below) of such <u>Purchaser has engaged in any "short sales" (as such term is defined in Rule 3b-3 promulgated under the Exchange Act) of the Common Stock</u>.  The Purchaser further agrees that neither the Purchaser nor any Affiliate of such Purchaser shall engage in any "short sales" of the Common Stock on or before the Closing Date.  The restrictions in this Section 4(n) shall not apply to any Affiliate of the Purchaser to the extent that such Affiliate is acting in the capacity of a broker-dealer executing unsolicited third party transactions.  Neither such Purchaser nor any of its Affiliates has taken, directly or indirectly, any other actions designed, or that might reasonably be expected to cause or result, under the Securities Act or the Exchange Act, or otherwise, in, or that has constituted, stabilization, or manipulation of the price of the Common Stock.

(Ex. 15, ¶ 4(n) (emphasis added).)

47.  The SmithMicro SPA defines "Common Stock" as that company's "authorized but unissued shares of common stock," which are the PIPE shares being issued.  (N.T. 3/10/10, pp. 3-4; Ex. 15, p. 1.)

48.  The SmithMicro SPA precludes only  "short sales" as "such term is defined in Rule 3b-3 promulgated under the Exchange Act."  (Ex. 15.)

49.  At the time of the SPA's effective date in February 2005, Rule 3b-3 did not exist. (Pl.'s Resp. Req. Admis. No. 10.)

50.  During the relevant time period, Berlacher, through the Defendant entities, never short sold the "Common Stock" as defined by the SmithMicro SPA.  (N.T. 3/11/10, pp. 52-53.)

51.  The SmithMicro PIPE was publicly announced on February 18, 2005.  (Ex. 19.)

## II.    LEGAL ANALYSIS - CONCLUSIONS OF LAW

### A.  Insider Trading - The Radyne Transaction

A person is liable for insider trading "when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." United States v. Chestman, 947 F.2d 551, 566 (2d Cir. 1990); see also, United States v. O'Hagan, 521 U.S. 642, 652 (1997). "The misappropriation theory is thus designed to 'protec[t] the integrity of the securities markets against abuses by "outsiders" to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary duty or other duty to th[e] corporation's shareholders.'" O'Hagan, 521 U.S. at 653 (citations omitted).

Although Sognefest's testimony was less than clear, on January 28, 2004, Sognefest provided Berlacher with information about a Radyne PIPE transaction. By their very nature, PIPE offerings are not publically announced until after the deal between the issuer and the PIPE share purchasers is closed. Therefore, Berlacher possessed nonpublic information and within minutes engaged in transactions involving Radyne stock through his barrier options basket account.[2] Thus, the only question that remains on the insider trading claim is whether that information was material. For reasons set forth below, we conclude that the SEC has not established its insider trading claim because it has not proven by a preponderance of the evidence that the information

---

[2] We are cognizant that conflicting evidence was presented about whether PIPE information contained on a Yahoo! Finance message board rendered that information "public," but for the reasons discussed infra, we need not resolve this issue.

regarding the Radyne PIPE was material.[3]

Generally, information is material if it is "information that would be important to a reasonable investor in making his or her investment decision." Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997)). Undisclosed information is generally considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the "total mix" of information' available to that investor." Oran, 226 F.3d at 282 (citing In re Westinghouse Sec. Litig., 90 F.3d 696, 714 (3d Cir. 1996)). As opposed to guessing what a reasonable investor would find important or what could alter the total mix of information in the market, the United States Court of Appeals for the Third Circuit has adopted a concrete method of measuring the materiality of information. Burlington, 114 F.3d 1410. The Court recognized that in an efficient securities market,[4] "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the company's stock." Oran, 226 F.3d at 282. If there is no movement in the stock price, then the disclosed information is immaterial as a matter of law. Id. The Third Circuit's commitment to the Burlington-Oran rule has been recognized in cases such as In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261 (3d Cir. 2005) and United States v. Schiff, 538

---

[3] In an enforcement action, the SEC bears the burden of proving each element by a preponderance of the evidence. Herman & MacLean v. Huddleston, 459 U.S. 375, 387-91 (1983).

[4] An efficient market is open and developed so the price of a company's stock is determined by all of the information available about that company at that time. The New York Stock Exchange is generally considered to be an efficient market. Oran, 226 F.3d at 282 (citing Burlington, 114 F.3d at 1425.

F.Supp.2d 818 (D.N.J. 2008).

Consistent with the Third Circuit's post hoc analysis of stock price movement to determine materiality, defense expert, Prowse, conducted an event study[5] and determined that the Radyne PIPE was not material information to investors. During the pertinent time period, Radyne's stock was up or down 5% a week, and on any of the days on which information related to the Radyne PIPE was released to the public, the stock moved at most, 6.25%. Prowse opined that this price movement was statistically insignificant because such movement, as it related to the PIPE information, was not distinguishable from the typical day-to-day market volatility of the stock, e.g., everyday "noise." Thus, he concluded that the Radyne PIPE information was not material. Based upon Prowse's experience and informative review, we credit and accept this testimony. We also accept the methodology applied by Prowse in conducting an event study as

---

[5] The "event study" approach first assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock, see, e.g., RMED Intel, Inc. v. Sloan's Supermarkets, Inc., 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000), and then determines whether those abnormal returns are due to fraud or non-fraud related factors. See Bradford Cornell & R. Gregory Morgan, Using Finance Theory to Measure Damages in Fraud Market Cases, 37 UCLA L.Rev. 883, 899-900 (1990); accord Dura, 544 U.S. at 341, 125 S.Ct. 1627. The event study methodology is actually used by financial economists as a tool to measure and predict the effect on market prices from all types of new information relevant to a company's stock valuation. See John M. Bizjak & Jeffrey L. Coles, The Effect of Private Antitrust Litigation on the Stock Market Valuation of the Firm, 85 Am. Econ. Rev. 436 (1995); Michael I. Muoghalu et al., Hazardous Waste Lawsuits, Stockholder Returns, and Deterrence, 57 S. Econ. J. 357 (1990); David Prince & Paul Rubin, The Effects of Product Liability Litigation on the Value of Firms, 4 Am. L. & Econ. Rev. 44 (2002); W.K. Viscusi & J. Hersch, The Market Response to Product Safety Litigation, 2 J. Reg. Econ. 215 (1990).

In re Intelligroup Sec. Litig., 468 F.Supp.2d 670, 694 (D.N.J. 2006).

reliable and the best measure of materiality.

We are mindful that the SEC also presented an expert on materiality, Robert Lowry, who has more than 28 years of impressive experience working for the SEC. Lowry, however, did not conduct an event study and relied heavily upon his general familiarity with how securities markets operate. Lowry opined that the Radyne PIPE added shares to the float and thus, its announcement would "most likely" have caused the share price to decline, and therefore, was material. He did not, however, tie this opinion to any concrete comparison of typical Radyne stock price movement in the market over any defined period of time. Lowry also did not factor in Radyne's market volatility on a daily basis, nor did he consider the fact that the Radyne PIPE was not a typical PIPE transaction in that the issued stock came from a majority shareholder as opposed to the company itself. Therefore, although we have carefully considered Lowry's testimony and related evidence, as the fact finder, we credit and rely upon Dr. Prowse's opinions. (Ex. 53, pp. 1, 4-5, 13-14.)

In conclusion, given the lack of materiality, the SEC's insider trading claim fails.[6]

## B. **Fraud**

The SEC presses three arguments as to how Berlacher, on behalf of the Defendant entities, made material misrepresentations or omissions. First, it argues that Berlacher entered into confidentiality agreements with Sognefest regarding the Radyne, Hollywood and IDWK PIPE transactions and breached these agreements by engaging in prohibited trading. Second, it asserts that Berlacher signed the SPAs, and in doing so, made false misrepresentations as to what types

---

[6] In conjunction with this ruling, we also deny Defendants' motion in _limine_ to preclude Lowry's testimony. Procedurally, we also deny Defendants' motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c) as it relates to the insider trading claim.

of transactions he had or had not engaged in after learning of the PIPEs. Finally, it argues that Berlacher committed fraud based on his contract with CDC.

To establish a fraud claim in violation of Section 10(b) and Rule 10b-5 of the Exchange Act, the SEC must prove that Defendants: 1) made a material misrepresentation or a material omission as to which they had a duty to speak, or used a fraudulent device, 2) with _scienter,_ 3) in connection with the purchase or sale of securities. SEC v. Teo, No. 04-1815, 2009 WL 1684467, at *8 (D.N.J. June 12, 2009).

## 1. **Confidentiality Agreement with Sognefest**

Sognefest's testimony reflected an inability to remember, with any real certainty, specific conversations with Berlacher regarding the confidential nature of transactions. The SEC also did not establish that Sognefest provided Berlacher with any information regarding the number of securities that would be issued in each PIPE or the stock price. Sognefest's only specific recollection was that he advised Berlacher that he could not trade in the PIPE issuer's stock and that the information was confidential. Although the SEC was able to introduce "over the wall" forms for two (2) transactions confirming conversations with Berlacher, Sognefest acknowledged that he did not write the IDWK "over the wall form" and does not know who did. Sognefest also noted that he never explained to Berlacher that he was restricted from trading in derivatives such as options.

Given Berlacher's prior experience in PIPEs, and Sognefest's discussions with him (albeit disjointed), we suspect that Berlacher understood the trading restrictions relating to the PIPEs. This suspicion is not, however, sufficient proof to find that there was a "meeting of the minds" between Sognefest and Berlacher on the issue of the PIPEs' confidentiality and trading in the

PIPE companies securities. This is particularly the case when compared with the clear and unequivocal misrepresentations made by Berlacher in the SPAs. See infra Section 2. We thus, decline to find that the SEC has proven fraud by a preponderance of the evidence based on conversations with Sognefest. Accordingly, Berlacher could not have made a material misrepresentation as to such an agreement. (Find. 6-12.)

**2. Misrepresentations in the SPAs**

Both parties have gone to great lengths to discuss and dissect the concept of scienter as it relates to Berlacher's signing of the SPAs. We believe that this issue is relatively simple. It is clear that Berlacher signed the SPAs, as his signature appears on the Radyne, Hollywood and IDWK SPAs. While the SEC did not produce a signed copy of the SmithMicro SPA, those PIPE shares were issued to Berlacher and thus, the reasonable inference is that he signed the SmithMicro SPA. (N.T. 3/10/10, pp. 78-79, Exs. 1, 8, 11.) Therefore, Berlacher is bound by the terms and the representations he made therein, whether he remembers reading them or not. "[I]t will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." Upton v. Tribilcock, 91 U.S. 45, 50 (1875).

Each of the SPAs were also signed by Berlacher in connection with the sale or purchase of a security - the PIPE shares for each respective company. Thus, the only issues which remain on the fraud claims are: 1) whether Berlacher made misrepresentations by creating options in his basket account and later signing the SPAs stating he had not engaged in certain trading; and 2) whether those misrepresentations were material.

### a. **Radyne**

Berlacher learned about the Radyne PIPE on January 28, 2004. Over the course of three days - January 28, 2004, January 30, 2004, and February 2, 2004, Berlacher created a 114,000 share short option in Radyne in his basket account at CDC. Through his 114,000 share short option, Berlacher indirectly held a short position in Radyne. On February 12, 2004, Berlacher signed the Radyne SPA representing that neither he nor the Defendant entities held a short position, directly or indirectly, in Radyne's stock. By creating the options in his account, Berlacher made a misrepresentation when he later signed the SPA pledging that he did not have a short position. (Find. 20, 22-23.)

### b. **Hollywood**

Berlacher was contacted on January 22, 2004, regarding the Hollywood PIPE. On thirteen different occasions over the course of six days between February 3, 2004, and February 9, 2004, Berlacher established a 100,000 share long option in Hollywood in his basket account at CDC. Berlacher later signed the Hollywood SPA representing that he had not entered into any short options in Hollywood stock. Because Berlacher only had a long option, not the short option proscribed by the SPA, he did not make a misrepresentation with respect to the Hollywood SPA. (Find. 30-33.)

### c. **IDWK**

Berlacher first had information regarding the IDWK PIPE on April 27, 2004. Two days later, Berlacher established a 20,000 share long option in IDWK in his basket account at CDC. On April 30, 2004, and May 4, 2004, Berlacher subsequently sold 15,000 shares of that option, leaving a remaining 5,000 share long option. A week later, Berlacher signed the IDWK SPA

representing that he had not engaged in any transaction in the securities of the company. This was a misrepresentation because Berlacher had, in fact, engaged in a series of transactions in creating the long option and subsequently selling off 15,000 shares of that option. (Find. 37-40.)

### d. **SmithMicro**

Berlacher represented that he had not engaged in short sales of SmithMicro's common stock when he signed the SmithMicro SPA on February 18, 2005. The SEC never raised allegations suggesting that Berlacher transacted in any way in the SmithMicro PIPE shares prior to signing the SPA. Therefore, we find that Berlacher did not make a material misrepresentation with respect to the SmithMicro SPA. (Find. 44-50.)

### e. **Materiality of the Misrepresentations - Radyne & IDWK**

The first element of a Section 10(b)/Rule 10b-5 cause of action is a "materiality" component of the "misrepresentation or omission" upon which a defendant "had a duty to speak." Id. Precedent regarding the evaluation of this materiality component typically involves factual scenarios that differ from the facts before the Court and revolve around "corporate insiders" such as directors or officers of corporations. See, e.g., Basic Inc. v. Levinson, 485 U.S. 224 (1988) (applying the reasonable investor standard where shareholders alleged that a corporation and its directors had made materially false or misleading statements); Burlington, 114 F.3d 1410 (fashioning and applying efficient market analysis where investors alleged that a corporation and its officers had employed material misstatements and omissions in public disclosures); Oran, 226 F.3d 275 (applying efficient market analysis in a class action alleging that defendant pharmaceutical and some of its officers and directors materially misrepresented the safety of two of its drugs).

Here, the facts differ considerably from these cases in that Berlacher had no role, CEO, director or otherwise, in the relevant companies and only became an "insider" through receipt of information regarding the pending PIPE offerings. Consequently, the Burlington-Oran efficient market materiality test does not apply to the Berlacher transactions. That analysis envisions that the alleged "material misrepresentation" will, when disclosed, be incorporated into the stock price, allowing for a post hoc measurement of the firm's stock price. Oran, 226 F.3d at 282. We are cognizant of the Third Circuit's "clearest committment[s] to the efficient market hypothesis." See, Merck, 432 F.3d at 269. However, Berlacher's alleged misrepresentations cannot be readily analyzed through examining whether his misrepresentations in the Radyne and IDWK SPAs "would be important to a reasonable investor in making his or her investment decision." Burlington, 114 F.3d at 1425. Nor is it easily discernible whether disclosure of that information would have "altere[d] the price of the firm's stock." Oran, 226 F.3d at 282. Given Berlacher's size as an investor compared to the market and the number of options and PIPE shares he was purchasing compared to the total trading value of any one of the companies at issue, the market may never react to news about his "misrepresentations." Thus, the rationale underlying the Burlington-Oran test is not present here.

However, Berlacher may be liable nevertheless, because "materiality is something to be determined on the basis of the particular facts of each case." Basic Inc. v. Levinson, 485 U.S. at 238; see also, Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6 (1971) (Section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase of securities and should be read flexibly, not restrictively); SEC v. Dorozhko, 574 F.3d 42 (2d Cir. 2009) (court recognized SEC's straightforward theory of fraud based on an affirmative

misrepresentation).

Given the somewhat unique facts of this case, we believe the appropriate inquiry is:

1) whether a cause of action can be brought by the SEC where a purchaser of securities engages in misrepresentations with the issuer of the securities, which may, nonetheless, not have an effect on the efficient market; and 2) if such a cause of action is cognizable, has the SEC proved, by a preponderance of the evidence, that Berlacher made a material misrepresentation with <u>scienter</u> in connection with the sale or purchase of securities.

Although there is no Third Circuit precedent governing whether the SEC can pursue a Section 10(b)/ Rule 10b-5 claim under the present facts, <u>SEC v. Jakubowski</u>, 912 F.Supp. 1073 (N.D. Ill. 1996) establishes a logical standard to measure Berlacher's conduct.

In <u>Jakubowski</u>, a bank, which was converting from mutual to stock ownership, offered its account holders a preferential opportunity to purchase stock at a reduced rate before the common stock was sold publicly. Jakubowski, an attorney, who was not a bank account holder, solicited a secretary at his law firm who was a bank account holder, to purchase preferred stock. Thereafter, Jakubowski arranged for the secretary to turn over the stock to one of his business associates and promised the secretary a percentage of any profits made on the subsequent stock sale.[7] Jakubowski directed the secretary to sign the bank stock order form in which she acknowledged that the rights to purchase stock were not transferrable, noting the shares must be purchased "for the account of the person exercising such rights." <u>Id.</u> at 1077.

The SEC filed a complaint against Jakubowski alleging violations of Section 10(b), as

_____

[7] The stock was purchased by Jakubowski's secretary for $10 per share and subsequently sold by Jakubowski and his associate for $13.50 a share. <u>Id.</u> at 1077.

well as Rule 10b-5. Jakubowski sought dismissal of the complaint, raising several arguments, including that any alleged misrepresentations or omissions, were not material. In denying Jakubowski's motion, the Illinois District Court first noted that the fundamental purpose of the Exchange Act "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." Id. at 1078 (citing Basic, 485 U.S. at 234-35).

In analyzing materiality, the court noted that a statement is material if it "so alters the 'total mix' of information available to the investor that it has the potential to affect the investment decision." Jakubowski, 912 F.Supp. at 1083. Reasoning that an "investment decision" necessarily included fraud perpetrated on a seller, the Court found a misstatement or omission could be material "if it reasonably could have been expected to influence the decision to sell." Applying the facts to those principles, the Court found that the misstatements, undertaken at the direction of Jakubowski, were material in that they affected the investment decision of the offering bank as to whether to sell the shares of stock at a reduced rate. Id.

In adhering to the same materiality principles, the Court eventually granted summary judgement for the SEC. Finding Jakubowski's deception "material" as a matter of law, the Court noted that his "misstatements caused the banks to sell stocks to unqualified individuals." SEC v. Jakubowski, No. 94-4539, 1997 WL 156544, at *8 (N.D. Ill. Mar. 31, 1997). The Seventh Circuit affirmed, and in analyzing the facts under what appear to be contract principles, noted that "Jakubowski made his statements directly to the issuer of securities, in order to induce the issuer to accept his offer to buy. The offer was accepted and the shares issued." Jakubowski v. SEC, 150 F.3d 675, 679 (7th Cir. 1998). Regarding the materiality of these statements, the Court ruled

that materiality:

> . . . covers whatever is important enough to reasonable participants in an investment decision to alter their behavior.  Usually price (or facts that influence price) is all that matters to securities transactions, but Rule 10b-5 does not foreclose the possibility that the participants will deem other facts vital.

Id. at 681.

After careful analysis of the Jakubowski cases and the facts before this Court, we conclude that many similarities exist between Jakubowski's and Berlacher's conduct.  First, like Jakubowski, Berlacher's "misrepresentations" were not that of a typical insider such as a CEO, but rather, occurred when the purchaser of securities deceived the issuer of those securities.  In Berlacher's case, we conclude that this occurred on two occasions.  The first time was on February 12, 2004, when Berlacher signed the Radyne SPA and represented that he did not hold a short position, directly or indirectly, in any shares of Radyne stock.  The SEC has established that this statement was not true because on three occasions prior to February 12, 2004, Berlacher had purchased short options in Radyne stock.  Berlacher made a  misrepresentation for a second time on May 12, 2004, when he also represented to IDWK in the SPA that he had not engaged in any transactions in the securities of the company.  This representation was also false because two weeks before, Berlacher had obtained a long position on 20,000 shares of IDWK stock.  He then sold 15,000 shares of that option.

As in Jakubowski,  we find Berlacher's falsehoods were material because they involved information that would be "important enough to reasonable participants in an investment decision to alter their behavior."  Id. at 681.  Both the Radyne and IDWK SPAs contained provisions designed to specifically ensure that the purchaser of the offered PIPE securities had not, after

learning of the PIPE information, engaged in any trading on the securities. This is because SEC Regulation FD requires the issuers to obtain a promise of confidentiality from the "limited insider" purchasers until the PIPE sale becomes public knowledge. 17 C.F.R. § 243.100-243.103. As in Jakubowski, had Berlacher advised Radyne and IDWK that he had traded in their securities prior to signing the SPAs, such information reasonably could have "been expected to influence the decision to sell." Jakubowski, 912 F.Supp. at 1083.

Finally, just as the Jakubowski Court found that it was fair to assume that the bank would have refused to sell the stocks had they known the true purchasers of the stock, we also conclude that it is equally fair to assume that had Radyne and IDWK been aware that Berlacher had engaged in transactions on their securities with knowledge of the pending PIPE and prior to signing the SPAs, they would have refused to sell the PIPE stocks to Berlacher.

Accordingly, the misrepresentations made by Berlacher in both the Radyne and IDWK SPAs were material.

### 3. CDC Agreement

Berlacher had a standing "special expiration price options master agreement" with CDC which allowed him to create barrier options in his basket account. That agreement prohibited insider trading and contained a representation that Berlacher would not trade when he had material, non-public information about a company whose stock was the asset underlying his options. However, we have already found that Berlacher's transaction in the Radyne PIPE was not based upon his possession of material information. Thus, Berlacher's knowledge of that PIPE and subsequent creation of Radyne options at CDC cannot be the basis of a fraud claim on the CDC agreement. As to the other three PIPE's, the SEC failed to present any evidence on the issue

of the materiality of the non-public information. The CDC agreement prohibits only insider trading, and Berlacher did not engage in insider trading in any of the transactions at issue. Thus, he cannot be held liable for fraud under the CDC agreement.

## C. **Remedies**

The SEC urges that appropriate remedies include: a permanent injunction enjoining Defendants from committing future violations of the federal securities laws, disgorgement, awarding pre-judgment interest, and a civil monetary penalty. We address each in turn below.

### 1. **Injunctive Relief**

The SEC may seek an injunction in a federal district court to prevent violations of the securities laws. 15 U.S.C. § 78u(d). An injunction is appropriate where there is, "at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder." SEC v. Pardue, 367 F.Supp.2d 773, 777 (E.D. Pa. 2005) (citing Aaron v. SEC, 446 U.S. 680, 700-701 (1980)).

The reasonable likelihood of future violations is typically assessed by looking at several factors, including the nature of the violation, its egregiousness and its isolated or repetitive nature, and whether the defendant will, by virtue of his occupation, be in a position to violate again. SEC v. Youmans, 729 F.2d 413, 415 (6th Cir. 1984); see also SEC v. First City Fin. Corp., Ltd., 890 F.2d 1215, 1228 (D.C. Cir. 1989). Courts also consider the defendant's recognition of the wrongfulness of his conduct. SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100-1101 (2d Cir. 1972).

Our verdict is in favor of Berlacher on the insider trading claim and two of the fraud claims. The monetary remedy against Berlacher on the two fraud claims is significant. Berlacher

has had to endure an extensive SEC investigation and protracted litigation. He testified that he has ceased engaging in any trading, options or otherwise, in a company with whom he was pursuing a PIPE transaction and would continue to abstain from such trading in the future. We have no reason to disbelieve this testimony.

Having considered all these factors and the specific characteristics of the Defendant and the fraud he committed, we will not impose an injunction.

### 2. **Disgorgement**

Disgorgement has become the routine remedy for a securities enforcement action. If a person is found in violation and has profited from the ensuing transaction, courts generally order the disgorgement of those profits. SEC v. Yun, 148 F.Supp.2d 1287, 1290 (M.D. Fla. 2001). As an equitable remedy, disgorgement is not intended to operate as a fine. Id. Unlike damages, disgorgement is a method of forcing a defendant to give up the amount by which he was unjustly enriched. SEC v. P.B. Ventures, No. 90-5322, 1991 WL 269982, at *2 (E.D.Pa. Dec. 11, 1991). "The amount to be disgorged is not limited as a matter of law to the damages inflicted upon purchasers and sellers. The [Commission] does not stand in the shoes of the purchasers and sellers who it asserts were defrauded." SEC v. Penn Cent. Co., 450 F.Supp. 908, 916 (D.C.Pa. 1978).

Courts have "broad discretion in fashioning the equitable remedy of a disgorgement order." SEC v. Huffman, 996 F.2d 800, 803 (5th Cir. 1993); see also, SEC v. Pardue, 367 F.Supp.2d at 777. "Disgorgement need only be a reasonable approximation of profits causally connected to the violation." First City, 890 F.2d at 1231; see also, Manor Nursing Ctrs., 458 F.2d at 1104.

Because the dates on which Berlacher created his options positions all occurred before he signed the Radyne and IDWK SPAs, we have considered the full profits causally connected to those transactions.[8] Berlacher closed some positions three days after they were created, while holding onto others for a full four months. Given the lack of substantial time between the creation of the options and the subsequent closing of those options and the lack of any evidence showing a noteworthy intervening event during that time, that full time period is causally connected to the fraud.[9]

Accordingly, we calculated Berlacher's profit from the Radyne transactions by subtracting the value of his short options when they were closed from the cost of the options when opened. These detailed calculations are reflected in Appendix A and resulted in a total profit of $365,252.00 from the Radyne transactions. Similarly, we calculated Berlacher's profit from the IDWK transactions by subtracting his cost to create the long options from the value when closed. These calculations are reflected in Appendix B and reflect profit of $15,849.00. Combined,

---

[8] We note that two of the transactions on February 13, 2004, for Chardonnay and Cabernet occurred the day after Berlacher signed the SPA. However, those two transactions, involving a total of 64,000 "shares" of short options, were transferred to those accounts from other accounts managed by Berlacher. These transfers were nothing more than a continuation of the fraud committed just a few days earlier, and accordingly, have been factored into our disgorgement analysis.

[9] This case differs from SEC v. MacDonald, 699 F.2d 47 (1st Cir. 1983), where the defendant held on to the wrongfully obtained stocks for more than a year, resulting in a finding that the full time period was not causally connected. We also note that McDonald was an insider trading case where the court considered the causally connected time period in light of the defendant's ability to "fix" his wrong by covering the improperly obtained shares after the information was made public. Here, Berlacher could not "fix" his fraud because his fraud was that he traded, which could not be undone after the fact.

Berlacher's profit from the Radyne and IDWK transactions was $381,101.50.[10] See Appendix E.

Berlacher has urged that we reduce the verdict to account for the premiums paid by him to CDC to create and hold these options. Courts are divided on the issue of whether costs, such as premiums, to purchase "wrongfully obtained" securities should be deducted from profits. See, e.g., SEC v. Hughes Capital Corp., 917 F.Supp. 1080, 1087 (D.N.J. 1996) (costs not deducted because no evidence supporting them and case law to the contrary); SEC v. Kenton Capital, Ltd., 69 F.Supp.2d 1 (D.D.C. 1998) (did not deduct costs from disgorgement); SEC v. Great Lakes Equities Co., 775 F.Supp. 211 (E.D.Mich. 1991) (found deductions for overhead, commissions and other expenses not warranted); SEC v. United Monetary Servs., Inc., No. 83-8540, 1990 WL 91812 (S.D.Fla. May 18, 1990) (no deductions for commissions or printing costs); but see, e.g., SEC v. Shah, No. 92-1952, 1993 WL 288285 (S.D.N.Y. July 28, 1993) (allowing deduction for broker's commission because consistent with position that disgorgement is not a penalty assessment); SEC v. Thomas James Assocs., Inc., 738 F.Supp. 88, 94-95 (W.D.N.Y. 1990) (finding that an offset for expenses was consistent with the purpose behind calculating the amount by which the defendant was unjustly enriched).

Given the measurable nature of the premiums paid by Berlacher and our broad discretion in calculating disgorgement, we are awarding disgorgement of net, not gross profits, because they most accurately represent the amount by which Berlacher was unjustly enriched.

Berlacher testified that he owed CDC a 6% premium on short options amortized over 370 days, and a 13% premium on long options amortized over 370 days. (N.T. 3/11/10, p. 43.) We

---

[10]  These calculations are based on information found in the Defendants' CDC account statements which can be found in a multitude of the exhibits submitted at trial and post-trial in the form of exhibits to briefs on disgorgement.

calculated the premium by taking the appropriate percentage (6% or 13% depending on whether the transaction was long or short) of the total cost of the transaction. We then divided that number by 370 days to get the premium per day, and then multiplied that number by the number of days each group of options was held. The total premiums for the Radyne transaction were $28,015.39, and the total for IDWK was $362.43. See Appendices C & D.

The final disgorgement amount, total profits less the premiums paid to CDC, is therefore, $352,363.68. See Appendix E.

### 3. **Civil Penalties**

The Insider Trading and Securities Fraud Enforcement Act permits courts, in light of the facts and circumstances of a particular case, to impose a civil penalty up to "three times the profit gained or loss avoided as a result of such unlawful purchase, sale or communication" arising from insider trading. 15 U.S.C. § 78u-1. Civil penalties are intended to "enhance deterrence against insider trading, and where deterrence fails, to augment the . . . detection and punishment of this behavior." Yun, 148 F.Supp.2d at 1295. A wide variety of factors are considered in determining whether penalties are in order and in what amount, including the egregiousness of the violations, the isolated or repeated nature of the violations, the degree of scienter involved, the deterrent effect given the defendant's financial worth, and other penalties arising from the conduct. Id.

Having considered all of these factors and the size of the disgorgement amount, we will not impose a civil penalty.

### 4. **Interest**

Similarly, given the size of the disgorgement amount and our broad discretion in the amount of disgorgement, we will not award prejudgment interest. SEC v. Antar, 97 F.Supp.2d 476, 589

(D.N.J. 2000).

### III.    <u>**CONCLUSION**</u>

For the foregoing reasons, we conclude  the SEC has not established that Defendants engaged in insider trading in the Radyne transaction. The SEC has established that Defendants made material misrepresentations amounting to fraud in violation of Section 10(b) and Rule 10b-5 of the Exchange Act in connection with the Radyne and IDWK transactions, but not regarding the Hollywood and SmithMicro transactions.  Our Order follows.

| Defendant | date short option created | # of shares in option | price per "share" when opened | total cost | date short option closed | price per "share" when closed | value | profit or loss |
|---|---|---|---|---|---|---|---|---|
| Berlacher | 1/28/04 | 20,000 | $12.5813 | $251,626.00 | 2/13/04 | $12.5700 | $251,400.00 | $226.00 |
| Berlacher | 1/30/04 | 25,000 | $11.8746 | $296,865.00 | 2/13/04 | $12.5700 | $314,250.00 | - $17,385.00 |
| Chardonnay | 1/28/04 | 5,000 | $12.5813 | $62,906.50 | 2/13/04 | $12.5700 | $62,850.00 | $56.50 |
| Chardonnay | 1/30/04 | 10,000 | $11.8746 | $118,746.00 | 2/13/04 | $12.5700 | $125,700.00 | -$6,954.00 |
| Chardonnay | 2/2/04 | 4,000 | $12.0000 | $48,000.00 | 2/13/04 | $12.5700 | $50,280.00 | -$2,280.00 |
| Lancaster | 1/30/04 | 10,000 | $11.8746 | $118,746.00 | 4/15/04 | $8.8300 | $88,300.00 | $30,446.00 |
| Insignia | 1/28/04 | 15,000 | $12.5813 | $188,719.50 | 6/3/04 | $8.9440 | $134,160.00 | $54,559.50 |
| Insignia | 1/30/04 | 15,000 | $11.8746 | $178,119.00 | 6/3/04 | $8.9440 | $134,160.00 | $43,959.00 |
| Insignia | 2/2/04 | 10,000 | $12.0000 | $120,000.00 | 6/3/04 | $8.9440 | $89,440.00 | $30,560.00 |
| **TOTALS:** | | **114,000** | | **$1,383,728.00** | | | **$1,250,540.00** | **$133,188.00** |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Chardonnay* | 2/13/04 | 19,000 | $12.5700 | $238,830.00 | 6/3/04 | $8.9440 | $169,936.00 | $68,894.00 |
| Cabernet* | 2/13/04 | 45,000 | $12.5700 | $565,650.00 | 6/3/04 | $8.9440 | $402,480.00 | $163,170.00 |
| **TOTALS:*** | | **64,000** | | **$804,480.00** | | | **$572,416.00** | **$232,064.00** |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **TOTALS:** | | **114,000** | | **$2,188,208.00** | | | **$1,822,956.00** | **$365,252.00** |

\* represents the values of a 64,000 share short option which were transferred to different accounts on February 13, 2004. Berlacher transferred 45,000 "shares" to Chardonnay, and Chardonnay transferred 19,000 "shares" to Cabernet. As these transfers are merely a continuation of the initial fraud under the Radyne SPA we have factored them into the disgorgement calculation.

**Appendix B: IDWK Disgorgement Chart**

| Defendant | date long option created | # of shares in option | price per "share" when opened | total cost | date long option closed | price per "share" when closed | # of "shares" closed | value | profit or loss |
|---|---|---|---|---|---|---|---|---|---|
| Cabernet | 4/29/04 | 5,000 | $4.5745 | $22,872.50 | 5/4/04 | $5.1875 | 2,500 | $12,968.75 | $4,721.25 |
| | | | | | 5/28/04 | $5.8500 | 2,500 | $14,625.00 | |
| Insignia | 4/29/04 | 5,000 | $4.5745 | $22,872.50 | 5/4/04 | $5.1875 | 2,500 | $12,968.75 | $4,721.25 |
| | | | | | 5/28/04 | $5.8500 | 2,500 | $14,625.00 | |
| Northwood | 4/29/04 | 10,000 | $4.5745 | $45,746.00 | 4/30/04 | $5.4200 | 2,500 | $13,550.00 | $6,406.50 |
| | | | | | 5/3/04 | $5.1200 | 4,500 | $23,040.00 | |
| | | | | | 5/4/04 | $5.1875 | 3,000 | $15,562.50 | |
| **TOTALS:** | | **20,000** | | **$91,491.00** | | | **20,000** | **$107,340.00** | **$15,849.50** |

| Defendant | total cost | x $0.06 premium | /370 days for premium per day | days option held | amortized premium for transaction |
|---|---|---|---|---|---|
| Berlacher | $251,626.00 | $15,097.56 | $40.8042 | 17 | $693.67 |
| Berlacher | $296,865.00 | $17,811.90 | $48.1403 | 15 | $722.10 |
| Chardonnay | $62,906.50 | $3,774.39 | $10.2011 | 17 | $173.42 |
| Chardonnay | $118,746.00 | $7,124.76 | $19.2561 | 15 | $288.84 |
| Chardonnay | $48,000.00 | $2,880.00 | $7.7838 | 12 | $93.41 |
| Lancaster | $118,746.00 | $7,124.76 | $19.2561 | 77 | $1,482.72 |
| Insignia | $188,719.50 | $11,323.17 | $30.6032 | 128 | $3,917.21 |
| Insignia | $178,119.00 | $10,687.14 | $28.8842 | 126 | $3,639.41 |
| Insignia | $120,000.00 | $7,200.00 | $19.4595 | 123 | $2,393.52 |
| Chardonnay* | $238,830.00 | $14,329.80 | $38.7292 | 112 | $4,337.67 |
| Cabernet* | $565,650.00 | $33,939.00 | $91.7270 | 112 | $10,273.42 |
| **TOTALS:** | **$2,188,208.00** | | | | **$28,015.39** |

**Appendix D: IDWK Premiums**

| Defendant | total cost | x $0.13 premium | /370 days for premium per day | days option held | amortized premium for transaction |
|---|---|---|---|---|---|
| Cabernet | $11,436.25 | $1,486.71 | $4.0181 | 6 | $24.11 |
| Cabernet | $11,436.25 | $1,486.71 | $4.0181 | 30 | $120.54 |
| Insignia | $11,436.25 | $1,486.71 | $4.0181 | 6 | $24.11 |
| Insignia | $11,436.25 | $1,486.71 | $4.0181 | 30 | $120.54 |
| Northwood | $11,436.25 | $1,486.71 | $4.0181 | 2 | $8.04 |
| Northwood | $30,585.25 | $2,676.08 | $7.2325 | 5 | $36.16 |
| Northwood | $13,723.50 | $1,784.06 | $4.8218 | 6 | $28.93 |
| **TOTALS:** | **$91,491.00** | | | | **$362.43** |

**Appendix E: Totals for Disgorgement**

| transaction | profit | - premium | total |
|---|---|---|---|
| Radyne | $365,252.00 | $28,015.39 | $337,236.61 |
| IDWK | $15,849.50 | $362.43 | $15,127.07 |
| **TOTALS:** | $381,101.50 | $28,377.82 | **$352,363.68** |