**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, | : | **Civil Action** |
| v. | : | **No. 07-3800** |
| ROBERT A. BERLACHER, et al., Defendants. | : | |

**Goldberg, J.** **February 14, 2012**

**Memorandum Opinion**

Several entities controlled by Defendant, Robert Berlacher (collectively, the "Applicants"), have moved, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (2006), for attorneys' fees and costs expended in defending against an SEC enforcement action. Because we find that the SEC's lawsuit was substantially justified, and its demands were reasonable, no attorneys' fees will be awarded.

## I. Background

The Court's findings in the initial action are set forth in detail in S.E.C. v. Berlacher, 2010 WL 3566790, at *1-7 (Sept. 13, 2010 Memo. Op., Doc. No. 118). What follows is a short summary of those findings.

After a three day bench trial, the Court found that Berlacher had engaged in two instances of securities fraud, but that there was insufficient evidence to find him liable on two other counts of fraud and one count of insider trading. Prior to trial, the Court also dismissed one of the SEC's claims against Berlacher and other defendants. (Doc. No. 32.)

Regarding the insider trading allegations, the SEC's position was that Berlacher had

nonpublic information about Private Investment in Public Equity offerings (PIPE), that the information was material, and that Berlacher traded on that information. Berlacher presented expert testimony attempting to establish that the information was not material.

After hearing testimony from both Berlacher's expert witness, Dr. Stephen Prowse, and an expert witness for the SEC, Robert Lowry, the Court credited the testimony of Dr. Prowse, who opined that the information at issue was not material. While mindful that Mr. Lowry had "more than 28 years of impressive experience working for the SEC," Dr. Prowse's testimony was accepted because he performed an event study in an attempt to determine materiality while Mr. Lowry did not. Berlacher, 2010 WL at *8. The Court recognized that an event study was more "[c]onsistent with the Third Circuit's post hoc analysis of stock price movement to determine materiality." Id. Thus, we concluded that the PIPE information was not material.

The SEC's position on all four fraud claims was that Berlacher "made misrepresentations by creating options in his basket account and later signing the [Stock Purchase Agreements (SPAs)] stating that he had not engaged in certain trading." Id. at *9. In order to participate in the PIPE offerings, Berlacher was required to sign SPAs in which he represented that he had not engaged in specific trading activities.

We rejected the SEC's position as to two of these fraud claims—the Hollywood PIPE transaction and the SmithMicro PIPE transaction. As to the Hollywood transaction, we found that because the SPA only stated that the purchaser had not entered into any short options in Hollywood stock, Berlacher's purchase of long options did not violate the agreement. Id. at *10. Regarding the SmithMicro PIPE, the SEC argued that the SPA prohibited Berlacher from engaging in short sales of SmithMicro's common stock, and that Berlacher had violated the agreement. However, we found

that the SPA defined "Common Stock" as the PIPE shares being offered, and noted that the "SEC never raised any allegations suggesting that Berlacher transacted in any way in the SmithMicro PIPE shares prior to signing the SPA." Id. at *6.

## II. Discussion

The Equal Access to Justice Act (EAJA) allows certain litigants to collect attorneys' fees from the government. Its stated purpose is to "foster a more cooperative, less threatening regulatory environment among agencies, small businesses, and other small entities" by making federal regulators "more accountable for their enforcement actions." 142 Cong. Rec. S3242 (daily ed. March 29, 1996). The Applicants argue that they are entitled to fees and costs under two distinct provisions of the EAJA: 28 U.S.C. § 2412(d)(1)(A) and 28 U.S.C. § 2412(d)(1)(D).

### A. Section 2412(d)(1)(A)[1]

The first section under which the Applicants' claim fees contains three elements. First, the statute indicates that to be eligible for an award of fees, the applicant must be a "prevailing party."[2] Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).[3] Second, the statute requires that the prevailing

---

[1] This section states: "Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

[2] 28 U.S.C. § 2412(d)(2)(B) defines a "party" to include only those individuals whose net worth is less than $2 million and only those owners of a business with a net worth of less than $7 million. Given our conclusions that the SEC's position was substantially justified, we need not consider this issue.

[3] Hensley dealt with 42 U.S.C. § 1988 rather than the EAJA, but its standards apply equally continue...

party actually incur the legal fees at issue. S.E.C. v. Comserv Corp., 908 F.2d 1407, 1413 (8th Cir. 1990). Finally, it requires the government's position not to have been substantially justified. Williams v. Astrue, 600 F.3d 299, 301 (3d Cir. 2009). For the reasons stated below, we find that the SEC has carried its burden of showing that its position was substantially justified throughout the litigation. Thus, it is unnecessary to discuss the first two elements of the statute in detail.[4]

The government bears the burden of proving that its position, both before and during litigation, was substantially justified. Scarborough v. Principi, 541 U.S. 401, 414 (2004). Substantial justification means that the position was "'justified in substance or in the main'–that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988). In other words, the government's position must have had a "reasonable basis in both law and fact." Id. (internal quotation marks omitted).

The United States Court of Appeals for the Third Circuit has expanded this general statement into a three-pronged test: the government must prove it had (1) a reasonable basis in truth for the facts alleged, (2) a reasonable basis in law for its legal theory, and (3) a reasonable connection

---

[3]...continue
"in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" Hensley, 461 U.S. at 433 n.7.

[4] The standard to establish that one is a prevailing party is not burdensome. The key is a "judicially sanctioned change in the legal relationship of the parties." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 605 (2001); Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 228 (3d Cir. 2011). The Applicants were the beneficiaries of such a change with respect to the Section 5 claim (which was dismissed), the insider trading claim, and the Hollywood and SmithMicro fraud claims (on which judgment was entered in their favor). Thus, we conclude that the Applicants prevailed on those issues within the meaning of the EAJA. See Precision Pine & Timber, Inc. v. United States, 83 Fed. Cl. 544, 548 (Fed. Cl. 2008) (observing that courts "include within the category of 'prevailing party' applicants that prevail on an *issue* or *issues* and achieve *some* of the benefits sought by the litigation").

between the facts alleged and the legal theories advanced. Williams, 600 F.3d at 302. The government will usually be able to show that its legal theory is reasonable if the case turns on an "unsettled or 'close question of law' . . . even if it was not ultimately accepted as a legal rule by the courts." Washington v. Heckler, 756 F.2d 959, 961-62 (3d Cir. 1985). However, an interpretation of the law that "clearly offends established precedent" will not be found to be substantially justified. Id. at 962.

The substantial justification inquiry is not repeated anew for each claim or legal theory. Given the fact that Berlacher prevailed on some, but not all, of the claims brought by the SEC, this directive is particularly relevant. A court must "arrive at one conclusion that simultaneously encompasses and accommodates the entire civil action." Williams, 600 F.3d at 302 (internal quotation mark omitted). This view is consistent with the pronouncement that courts should not conflate the determination of the merits of the case with the substantial justification inquiry. Id.; Morgan, 142 F.3d at 685 ("[T]he inquiry into reasonableness for EAJA purposes may not be collapsed into [the] antecedent evaluation of the merits, for EAJA sets forth a distinct legal standard" (alterations in original) (quoting Cooper v. U.S. R.R. Retirement Bd., 24 F.3d 1414, 1416 (D.C. Cir. 1994)).

As noted above, the Court's rulings favored both Berlacher and the SEC at different stages of the litigation. Pre-trial, the SEC's Section 5 claim was dismissed on the authority of S.E.C. v. Lyon, 529 F. Supp. 2d 444 (S.D.N.Y. 2008). The Court denied Defendants' motion to dismiss as to the rest of the claims, and later denied summary judgment. See S.E.C. v. Berlacher, 2009 WL 6608486 (E.D. Pa. Nov. 16, 2009) (denying summary judgment). After a bench trial on the five remaining claims, the Court found for the SEC on two of the fraud claims, and for Berlacher on the

other two fraud claims and the insider trading claim. The SEC's request for injunctive relief and for civil penalties was denied, but we granted the SEC's request for disgorgement of $352,363.68 in fraudulently-obtained profits. Berlacher, 2010 WL at *14-16.

The Applicants, of course, do not contend that the SEC's positions regarding the claims where the SEC prevailed were not substantially justified. Instead, they focus on (1) the dismissed Section 5 claim, (2) the insider trading claim, (3) the Hollywood fraud claim, and (4) the SmithMicro fraud claim. Although we are mindful of the Third Circuit's mandate that a single conclusion be reached as to the substantial justification of the whole action, Williams, 600 F.3d at 302, we will review each claim below.

**1. The Section 5 Claim**[5]

Applicants point out that the Court dismissed the SEC's Section 5 claim at the pleadings stage.[6] They also assert that because two other district court judges had granted motions to dismiss in other cases on identical theories, and because the Applicants had argued in their Wells Submission[7] that the SEC's theory was incorrect, the SEC's position should be considered substantially unjustified. The SEC responds that despite the fact that its position had been rejected by this and other district courts, it was still substantially justified in pressing the argument and in

---

[5] Section 5 is codified at 15 U.S.C. § 77e (2006).

[6] This Order was issued by the Honorable Eduardo C. Robreno, who was previously assigned to this case.

[7] After being notified by the SEC staff that it will seek approval from the Commission to institute an enforcement action, a prospective defendant may make a Wells Submission, which is attached to the staff's recommendation to the Commission. This submission essentially contains the prospective defendant's arguments as to why the Commission should not commence an enforcement action. S.E.C. v. Zahareas, 374 F.3d 624, 629 (8th Cir. 2004).

interpreting the securities laws in the way that it did.

By way of brief background, Section 5 prohibits the sale or delivery of unregistered securities, along with any offers to sell or deliver unregistered securities. S.E.C. v. Lyon, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008). PIPE shares are exempt from the registration requirement and therefore investors are required to represent that they will not distribute the PIPE shares they purchase. Id. at 447. The PIPE shares may not legally be resold until the resale registration statement becomes effective; to do otherwise would violate Section 5. Id. at 448.

The SEC alleged that Berlacher was engaged in illegal sales of the restricted PIPE shares by selling short the company's stock and then later, after the restrictions were lifted, covering the short position with the PIPE shares.[8] (S.E.C. Opp. Mem., at 11-12.) More expansively, the SEC alleged that Berlacher engaged in an illegal sale of the PIPE shares in several steps. Berlacher would acquire restricted PIPE shares, and then sell short as many shares of the company's stock as he could, up to the amount of PIPE shares he had purchased. After the registration statement for the PIPE shares became effective, Berlacher covered his short position with the cheaper PIPE shares. According to the SEC, the effect was to "lock-in" a gain that amounted to the difference between the price at which the short sale was effected and the price of the PIPE shares.[9] See Michael C. Macchiarola,

---

[8] Here, short selling refers to selling a security that the seller does not own, but has borrowed from another investor. The seller then has an obligation to return the borrowed shares at some point in the future. Returning identical shares to the investor from whom the shares were borrowed is known as "covering" or "closing out" the short position. The seller profits from a drop in the stock price because he or she is able to cover for less than the price at which the borrowed shares were initially sold.

[9] As an example, if the PIPE offering was made at $10/share, when the market price was $12/share, Berlacher could sell short the shares of the issuer for $12 each, knowing that he could
continue...

Get Shorty: Toward Resurrecting the SEC's Ill-Fated Pursuit of PIPE Arbitrageurs, 4 Va. L. & Bus. Rev. 1, 15 (2009) (describing the strategy of selling short a PIPE issuer's stock to hedge against an expected decrease in the share price after the public announcement of the PIPE).

Thus, at the core of the SEC's theory was the claim that, at the time Berlacher sold short shares of the issuer's stock, he was actually engaging in the first step of a transaction intended to dispose of the restricted PIPE shares. (S.E.C. Opp. Mem., at 11.) In the SEC's view, covering with the PIPE shares consummated a transaction in which the PIPE shares were actually "sold" on the date the short sale took place. As the SEC explains, "the short sales were the means by which the Defendants monetized their interest in the PIPE shares." (Id., at 12.)

Because there was a reasonable basis in truth for the facts supporting the Section 5 claim, and a reasonable connection between the facts alleged and the legal theories advanced, the only question is whether there is a reasonable basis in law for the SEC's legal theory. As noted above, this theory was previously rejected in two cases: S.E.C. v. Mangan, 2007 WL 4102743 (W.D.N.C. Oct. 24, 2007); and S.E.C. v. Lyon, 529 F. Supp. 2d 444 (S.D.N.Y. 2008). This does not, however, preclude the theory from being substantially justified. See Morgan, 142 F.3d at 670 (noting that the "EAJA is not a 'loser pays' statute," and so a loss on the merits does not automatically make a position unjustified).

While the legal question here is a close one, and we do not view rejection of the theory by two other district courts to be grounds for concluding that the SEC's position "clearly offends

[9]...continue
later cover with the $10 PIPE shares and make a profit of $2/share, no matter what happened to the stock price in the interim.

established precedent." Washington, 756 F.2d at 962. One commentator has argued at length that courts who have rejected this theory (including this Court) "all got it wrong," which is an indication that, at the very least, there is not universal agreement that the SEC's theory is invalid. Macchiarola, supra, 4 Va. L. & Bus. Rev. at 40. The same commentator has also noted that prior to having its Section 5 theory rejected in the two cases above, the SEC used this type of claim to obtain various favorable settlements with defendants accused of Section 5 violations. See id., at 23-24 (describing the string of settlements negotiated by the SEC on the basis of its interpretation of Section 5). Whatever the conclusion reached by the courts above, defendants, at least prior to the Mangan ruling, apparently saw some merit in the SEC's interpretation.

The SEC's Section 5 theory has not been tested above the district court level, has been strongly defended by at least one legal scholar, and has been used successfully by the SEC as a settlement tool. Under these circumstances, we cannot say that the SEC's theory had no reasonable basis in law, and conclude that it was substantially justified.

**2. The Insider Trading Claim**

We also conclude that Berlacher's success on the insider trading claim does not justify the award of attorneys' fees. The disagreement at trial involved whether the nonpublic information to which Berlacher was privy was "material." Berlacher, 2010 WL at *7. The SEC presented testimony from Robert Lowry, an expert with "more than 28 years of impressive experience working for the SEC," that if credited, would have established that the information was material. Though the Court found Dr. Prowse's testimony to be more consistent with Third Circuit precedent, our decision to accept his opinion did not in any way mean that Mr. Lowry's testimony was wholly without merit, or that the SEC was unreasonable in maintaining that the information was material.

**3. The Hollywood PIPE Fraud Claim**

When Berlacher signed the Hollywood PIPE SPA, he represented that he had not "purchased, sold or entered into any put option, short position or similar arrangement with respect to Common Stock." Berlacher, 2010 WL at *5. While Berlacher did not enter into any short position with respect to the Hollywood stock, he did enter into a long option. Id. The Court found this to be consistent with his representation, interpreting the SPA to preclude only the purchasing of put options, short options, or "similar arrangements." The SEC, on the other hand, argued that the term "purchased" modified "Common Stock," and that the SPA precluded not only the purchasing of short options, but all transactions in the company's common stock. (S.E.C. Opp. Mem., at 16.)

While we found the SEC's position to be in tension with the plain language of the agreement, its interpretation of the SPA was not entirely unreasonable. Additionally, the SEC introduced an "over the wall" form consistent with its view that Berlacher was prohibited from trading in the Hollywood stock as a condition of the PIPE offering. We thus conclude that there was a reasonable basis in fact and law for the SEC's position.

**4. The SmithMicro Fraud Claim**

When Berlacher entered into the SmithMicro SPA, he represented that he had not "engaged in any 'short sales' . . . of the Common Stock" of SmithMicro. Berlacher, 2010 WL at *6. We found that under the SPA, "Common Stock" was defined as the "'authorized but unissued shares of common stock,' which are the PIPE shares being issued," and therefore Berlacher's position (an option to acquire a 75,000 share short position in SmithMicro common stock) did not violate the terms of the agreement. Id. at *10. The question for the purpose of this motion is whether the SEC had a reasonable basis to make the argument that "Common Stock" in the SPA should be defined

more broadly.

The SEC's position at trial was that the portion of the SPA defining "Common Stock" as the PIPE shares could not have been meant to apply to the prohibition on short selling. (S.E.C. Opp. Mem., at 17.) The SEC reasoned that if it did, the definition would nullify the no-shorting provision because any sale by Berlacher of the PIPE shares he owned would be long, not short. (Id.)

Although we ultimately found that the SEC's interpretation was at odds with the language of the SPA, the SEC's position certainly had a reasonable basis in fact. Indeed, even Berlacher conceded at trial that under the plain language of the SPA, he could not comprehend how a trader could violate the no-shorting provision, stating "I don't know how you would short PIPE shares." (N.T. 3/11/10, p. 4) Therefore, the SEC's position that "Common Stock" meant the common stock of the company, notwithstanding the SPA's definition, was reasonable even though it was ultimately rejected by the Court.

**5. Conclusion - Section 2412(d)(1)(A)**

After consideration of all the claims raised by the SEC on which the Applicants were found not liable, and further consideration of the fact that Berlacher was found liable for serious violations of the securities laws, and after review of the SEC's entire case, we conclude that the SEC has met its burden of showing that its position as a whole, both before and throughout litigation, was substantially justified.[10] As a result, the Applicants are not entitled to attorneys' fees under 28 U.S.C. § 2412(d)(1)(A).

---

[10] The SEC also argues that none of the Applicants actually "incurred" fees within the meaning of the EAJA. Because we conclude that the SEC's position was substantially justified, we need not decide whether the Applicants have actually incurred any fees.

**B. Section 2412(d)(1)(D)**[11]

The function of § 2412(d)(1)(D) is to permit non-prevailing parties to recover fees and expenses where the United States obtained a judgment that was substantially and unreasonably less than its initial demand. Am. Wrecking Corp. v. Sec'y. of Labor, 364 F.3d 321, 328 (D.C. Cir. 2004). Importantly, 28 U.S.C. § 2412(d)(1)(D) can only apply to claims on which the Applicants did not prevail. Park Manor, Ltd. v. U.S. Dept. of Health & Human Servs., 495 F.3d 433, 437 (7th Cir. 2007) (holding that the "sensible interpretation" confines section (d)(1)(D) to "the case in which the government prevails but the relief it obtains is meager in comparison to the relief it had sought"); Am. Wrecking Corp., 364 F.3d at 328. This is consistent with the statutory text, which provides for an award of fees where the government's demand is "substantially in excess of the judgment finally obtained *by the United States*." 28 U.S.C. § 2412(d)(1)(D) (emphasis added).

The EAJA defines the government's demand as "the express demand of the United States which led to the adversary adjudication," but the definition excludes "a recitation of the maximum statutory penalty." Id. at § 2412(d)(2)(I). The "judgment finally obtained" that must be compared to the demand may include a settlement. Id. at § 2412(d)(2)(G); United States v. One 1997 Toyota Land Cruiser, 248 F.3d 899, 904 (9th Cir. 2001).

---

[11] "If, in a civil action brought by the United States or a proceeding for judicial review of an adversary adjudication described in Section 504(a)(4) of title 5, the demand by the United States is substantially in excess of the judgment finally obtained by the United States and is unreasonable when compared with such judgment, under the facts and circumstances of the case, the court shall award to the party the fees and other expenses related to defending against the excessive demand, unless the party has committed a willful violation of law or otherwise acted in bad faith, or special circumstances make an award unjust. Fees and expenses awarded under this subparagraph shall be paid only as a consequence of appropriations provided in advance." 28 U.S.C. § 2412(d)(1)(D).

Before a court can award fees, it must find that a comparison of the demand and the judgment finally obtained indicate that the demand was "unreasonable . . . under the facts and circumstances of the case." 28 U.S.C. § 2412(d)(1)(D). The legislative history indicates that Congress did not intend fees to issue under subsection (d)(1)(D) "as a matter of course." 142 Cong. Rec. S3244 (daily ed. March 29, 1996). Instead, the intent of the subsection is to "assist in changing the culture among government regulators to increase the reasonableness and fairness of their enforcement practices." Id.

Congress suggested that the comparison is "always between a 'demand' by the government for injunctive and monetary relief taken as a whole and the final outcome of the case in terms of injunctive and monetary relief taken as a whole." Id. However, this comparison should not boil down to a "mathematical" calculation. Id. Rather, the subsection is aimed at rooting out occasions on which a government agency fails to make a "reasonable effort to match the penalty to the actual facts and circumstances of the case." Id.

Courts have thus eschewed a strict mathematical analysis in favor of a case-by-case determination of reasonableness (though the cases are few). Thus, in Sec'y of Labor v. Wolkow Braker Roofing Corp., 2000 WL 1466087, at *7 (OSHRC Sept. 25, 2000), the Occupational Safety and Health Review Commission found it important that "the Secretary . . . obstinately refused to engage in meaningful settlement discussions even after the hearing on the merits when it should have been apparent . . . that her case contained serious weaknesses." The Commission found the ultimate $4,000 penalty to be substantially less than the government's initial demand of $61,100. Id.

Here, Berlacher and the entities he controlled were ordered to pay $352,363.68 in disgorgement as a result of their violations of the securities laws. The Court, in its discretion, chose

not to impose an injunction, and also chose not to order Berlacher to pay civil penalties or interest in connection with the disgorgement remedy. Berlacher, 2010 WL at *14-16.

The Applicants argue that the SEC's judgment was substantially in excess of the demands in its complaint for disgorgement of "$1.7 million in ill-gotten gains," (Compl. ¶ 29), along with an injunction, pre-judgment interest, and civil penalties of an unspecified amount. However, after the Court dismissed the Section 5 claims, the SEC amended its complaint to seek a lesser amount in disgorgement – an unspecified "hundreds of thousands of dollars." (Am. Compl. ¶ 1.) While the Court chose not to impose interest, civil penalties, or an injunction, we specifically cited to our "broad discretion in the amount of disgorgement." Berlacher, 2010 WL at *16. We found that the already large size of the disgorgement amount weighed against further damages, and that the refusal to impose additional penalties or interest was not due to a lack of merit in the SEC's demand. Neither the complaints nor the judgment indicate that the SEC ever made anything less than a reasonable attempt to match its demand to "the facts and circumstances of the case." 28 U.S.C. § 2412(d)(1)(D). We thus conclude that the judgment was not substantially less than the SEC's demand so to render it unreasonable under the circumstances.

**III. Conclusion**

The purposes of the EAJA would not be served by an award of fees in this case, because, viewing the case in its entirety, the position of the SEC was substantially justified. Moreover, the demand of the SEC was not substantially in excess of the judgment it obtained, nor unreasonable given the facts of the case. Therefore, we find that the EAJA does not entitle Applicants to an award of any of their attorneys' fees.

Our order follows.